IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

ST. JUDE MEDICAL S.C., INC., a
Minnesota corporation, ANDREW
HALLETT, an individual,

        Plaintiffs,

vs.

BIOSENSE WEBSTER INC., a California
corporation,

        Defendant.

_____/

CASE NO.:6-13-cv-000333-JA-TBS

## DEFENDANT BIOSENSE WEBSTER'S ANSWER AND AFFIRMATIVE DEFENSES AND COUNTERCLAIM AND DEMAND FOR JURY TRIAL

Defendant, Biosense Webster Inc., ("BWI") hereby sets forth its Answer and Affirmative Defenses to the Complaint. BWI denies all allegations of the Complaint not specifically admitted herein and further responds as follows[1]:

1.      BWI admits the nature of the action, Plaintiffs' purpose, and that an actual controversy exists between BWI and the Plaintiffs. BWI denies the Complaint has merit.

2.      BWI admits it has taken a position concerning Hallett's Non-Competition Agreement, but BWI denies that its position is framed accurately by Plaintiffs and otherwise denies the allegations of paragraph 2.

3.      BWI admits the paragraph's allegations for jurisdictional purposes only and otherwise denies the paragraph's allegations.

---

[1] The paragraph numbers used herein correspond to the paragraph numbers of the Complaint.

4.      BWI admits Hallett previously worked for BWI.  BWI is without sufficient knowledge of or information to form a belief as to the paragraph's remaining allegations and therefore denies same.

5.      BWI admits the paragraph's allegations.

6.      BWI admits the paragraph's allegations.

7.      BWI admits the paragraph's allegations.

8.      BWI admits the paragraph's allegations.

9.      BWI admits the parties' dispute centers on the application of the BWI non-competition agreement to SJM's current or prospective employment of Hallett, denies the characterization of the dispute and otherwise denies all allegations not specifically admitted herein.

10.     BWI admits the paragraph's allegations.

11.     BWI admits the paragraph's allegations.

12.     BWI admits CRM devices are used to regulate a patient's heartbeat and that such devices include pacemakers, defibrillators and cardiac resynchronization products.  BWI further admits that lead wires or leads may be used in connection with CRM devices.  BWI denies all allegations not specifically admitted herein.

13.     BWI admits the paragraph's allegations.

14.     BWI denies that AF diseases are not treated by CRM devices and otherwise admits the paragraph's allegations.

15.     BWI admits the paragraph's allegations.

16.     BWI denies the paragraph's allegations.

2

17.   BWI admits that SJM markets and distributes CRM, AF and ultrasound devices for use in conjunction with treating various cardiac arrhythmias. BWI denies all allegations of paragraph 17 not specifically admitted herein.

18.   BWI admits that it does not sell CRM devices or leads.  BWI denies all allegations of paragraph 18 not specifically admitted herein.

19.   BWI admits that BWI's product line includes AF devices such as mapping devices and ablation catheters.  BWI denies all other allegations of paragraph 19.

20.   BWI denies the paragraph's allegations.

21.   BWI admits that BWI employed Hallett as a Clinical Account Specialist to sell and to provide services with respect to, among other products, BWI's AF products in the Jacksonville, Florida area and other areas.  BWI admits that Hallett's BWI customers included Drs. Oza, Sippen and Magnano as well as St. Vincent's Hospital in Jacksonville, Florida.  BWI denies all allegations not specifically admitted herein.

22.   BWI admits that, at the commencement of his employment with BWI, Hallett signed a non-competition agreement and further admits that a copy of the agreement is attached to the Complaint.  BWI denies all allegations of paragraph 22 not specifically admitted herein.

23.   BWI admits the quoted language is excerpted from the non-competition agreement and refers to the agreement for a complete expression of its terms.

24.   BWI admits the quoted language is excerpted from the non-competition agreement and refers to the agreement for a complete expression of its terms.

25. BWI denies that Hallett "resigned" and is otherwise without sufficient knowledge or information to form a belief as to the paragraph's remaining allegations.

26. BWI is without knowledge or information as to what Hallett "seeks" to do for SJM; however, BWI denies he is entitled, pursuant to the terms of his BWI non-compete agreement, to engage in the activities described in this paragraph and therefore denies the paragraph's allegations.

27. BWI denies the paragraph's allegations.

28. BWI admits that BWI has taken the position that Hallett may not sell or service SJM CRM products to or for his former BWI customers or AF products to or for customers and otherwise denies the paragraph's remaining allegations.

29. BWI admits sending a letter dated February 22, 2013 to SJM and that two of BWI's demand letters are attached to the Complaint as Exhibits B and C, and BWI refers to the letters for complete expression of their content. BWI otherwise denies the characterization of the letters and the paragraph's remaining allegations.

30. BWI denies the allegation that Hallett "is not in a position to disadvantage Biosense or benefit St. Jude through the use or disclosure of any confidential information" and is otherwise without sufficient knowledge or information to form a belief as to the paragraph's remaining allegations and thus denies the paragraph's remaining allegations.

31. BWI denies the paragraph's allegations.

32. BWI denies the paragraph's allegations.

33. BWI admits it does not sell a line of CRM products and denies the paragraph's remaining allegations.

34.     BWI denies the paragraph's allegations.

35.     BWI admits Hallett previously worked for BWI and is otherwise without sufficient knowledge or information to form a belief as to the paragraph's remaining allegations and thus denies the paragraph's remaining allegations.

36.     BWI denies the allegations that St. Jude's CRM devices are not competitive with BWI's AF devices. BWI is without sufficient knowledge or information concerning the CRM devices and leads that Hallett sells or intends to sell to form a belief as to as to the paragraph's remaining allegations and therefore denies the paragraph's remaining allegations.

37.     BWI denies the paragraph's allegations.

38.     BWI denies the paragraph's allegations.

39.     BWI admits BWI has taken the position that Hallett, as a result of his SJM employment, is violating his Employment Agreement.   BWI denies all allegations of paragraph 39 not specifically admitted herein.

40.     BWI reasserts its responses to paragraphs 1 through 39.

41.     BWI admits that Hallett's Employment Agreement contains the quoted language, denies SJM's characterization of the language is accurate, refers to the Employment Agreement for a complete expression of its terms, and denies all allegations not specifically admitted herein.

42.     BWI denies the paragraph's allegations.

43.     BWI admits that it does not manufacture, sell or service CRM products otherwise denies the paragraph's allegations.

44.     BWI admits a controversy exists between the parties regarding SJM's employment of Hallett but denies that Plaintiffs have framed the controversy accurately. BWI denies all allegations of paragraph 44 not specifically admitted herein.

45.     BWI admits a controversy and denies that Plaintiffs have framed the controversy accurately. BWI denies all allegations of paragraph 45 not specifically admitted herein.

46.     BWI admits that Hallett's Employment Agreement contains the quoted language, denies SJM's characterization of the language is accurate, and refers to the Employment Agreement for a complete expression of its terms.  BWI denies all allegations of paragraph 46 not specifically admitted herein.

47.     BWI admits a controversy and denies that Plaintiffs have framed the controversy accurately. BWI denies all allegations of paragraph 47 not specifically admitted herein.

48.     BWI is without sufficient knowledge or information to form a belief as to the paragraph's allegations.

49.     BWI admits a controversy, denies that Plaintiffs have framed the controversy accurately and denies all allegations of paragraph 49 not specifically admitted herein.

50.     BWI is without sufficient knowledge or information to form a belief as to the Plaintiffs' doubts and otherwise denies the paragraph's allegations.

## REQUESTED RELIEF:

BWI denies the Plaintiffs are entitled to the relief they seek herein.

## AFFIRMATIVE DEFENSES

6

BWI asserts the following Affirmative Defenses in response to the Complaint:

1.     Plaintiffs' claims are defeated because of their failure to satisfy all conditions precedent to Hallett's lawful employment with SJM, including but not limited to providing all written assurances required by the Employment Agreement.

2.     Plaintiffs' claims are defeated by the plain terms of the Employment Agreement.

3.     Plaintiffs' claims are barred by estoppel insofar as SJM has taken contrary positions in public statements concerning competition with BWI and the cross-marketing of AF and CRM products by SJM's account specialists.

4.     Plaintiffs' claims are barred by estoppel insofar as the Plaintiffs have, upon information and belief, expressed contrary positions to BWI and BWI's customers.

5.     Plaintiffs' claims are barred by waiver insofar as Hallett knowingly relinquished his right to obtain the declarations he seeks by entering into the BWI Employment Agreement and accepting valuable consideration in exchange for the restrictive covenants.

6.     Plaintiffs' claims are barred by their own inequitable conduct, to the extent discovery demonstrates that they have misappropriated any of BWI's confidential information.

7.     Plaintiffs' claims are barred by the doctrine of unclean hands.

8.     Plaintiffs' claims are barred insofar as the declarations sought are unconscionable and contrary to public policy and prevailing law.

9.      Plaintiffs' claims are barred insofar as the declarations sought would deprive BWI of the consideration for the bargain it struck with Hallett.

10.     Plaintiffs fail to state a claim upon which relief may be granted.

### Reservation of Rights

Defendant reserves the right to amend its Answer and Affirmative Defenses to incorporate additional defenses and facts which may be discovered during the course of this litigation.

## COUNTERCLAIM AND DEMAND FOR JURY TRIAL

BIOSENSE WEBSTER, INC. ("BWI") sues plaintiff/counter-defendant, ST. JUDE MEDICAL, S.C., INC. ("SJM") and plaintiff/counter-defendant ANDREW HALLETT and states as follows:

1.      Andrew Hallett, a former employee of BWI, served as a clinical account specialist for BWI's medical device sales and product support team in the North Florida market.  BWI paid him well, invested a great deal of time and money in his training, provided him with the company's confidential information, including information regarding its customers, and entrusted him to preserve and cultivate BWI's longstanding relationships with many leading electrophysiologists and hospitals — business relationships which generate millions of dollars in annual revenue for BWI.

2.      In order to protect its investment in the specialized training it provided Hallett, the customer relationships he acquired, developed, and maintained for and on BWI's behalf, as well as other confidential information BWI provided him, at the commencement of his

employment, BWI asked Hallett to commit to a non-competition agreement, as is standard in the industry. Hallett did.

3.    In or about November 2012 Hallett's employment with BWI ended and he subsequently commenced employment with SJM.

4.    Hallett's non-competition agreement with BWI requires him to identify his new employer, job title, and job responsibilities. Additionally, Hallett's Non-Competition Agreement requires him to provide BWI with written assurances that he will comply with the terms of the Non-Competition Agreement.

5.    Despite BWI's repeated attempts to obtain from Hallett information about his work for SJM, Hallett has failed and refused to provide BWI with such information.

6.    BWI understands that Hallett has accepted employment with SJM, one of BWI's main competitors.

7.    BWI has attempted to obtain from SJM information related to its employment of Hallett. SJM has refused to provide such information.

8.    BWI and SJM both manufacture and sell certain medical devices physicians use to treat a variety of heart diseases.

9.    The companies are direct competitors and their products are used primarily by cardiologists, known as electrophysiologists, who are trained in the subspecialty of electrophysiology ("EP").

10.    Hallett's and SJM's refusal to communicate with BWI, as required by the Non-Competition Agreement, is all the more troubling to BWI because Hallett marks the fifth former Florida BWI employee SJM has hired since June 2012. The four others are the

subject of ongoing litigation before this very Court in cases numbered 6:12-cv-01569 and 6:13-cv-00258.

11.     BWI is concerned that Hallett will follow in the footsteps of the other former BWI employees. However, without the requested relief of specific performance of Hallett's Non-Competition Agreement — specifically, the provisions requiring Hallett to provide BWI with information on his new position and written assurances that he will not render services to a competitor — BWI cannot know Hallett's current employment status, or evaluate and enforce its other rights under the Non-Competition Agreement with Hallett.

## I.   PARTIES

12.     BWI is a corporation in good standing organized under the laws of the State of California. Its corporate headquarters and principal place of business is in California.

13.     Hallett is a resident of Florida with a last known address of 2231 Mount Vernon Street, Orlando, Florida 32803.

14.     SJM is a Minnesota corporation with its principal place of business in Texas.

## II.   JURISDICTION AND VENUE

15.     The Court has diversity jurisdiction pursuant to 28 U.S.C. §1332(a) because this action involves citizens of different states and the amount in controversy exceeds the sum and value of $75,000, exclusive of interest, costs and attorneys' fees.

16.     Venue is proper in this District under 28 U.S.C. § 1391(a) because Hallett resides within the District, St. Jude is subject to personal jurisdiction in this District (including this Division) and because a substantial part of the events giving rise to the claims occurred within the District.

### III. FACTUAL BACKGROUND

17.     BWI designs, manufactures, markets, and sells a broad portfolio of advanced, minimally invasive, computer-based imaging, ultrasound and electrophysiology devices used by physicians to diagnose and treat a variety of cardiac arrhythmias, such as atrial fibrillation ("AFib" or "AF").

18.     BWI is the market leader in the development and sale of diagnostic and therapeutic products designed to assist with the surgical treatment (i.e., ablation) of AFib. BWI's products are used by cardiologists, known as electrophysiologists, who are trained in the subspecialty of electrophysiology ("EP").    The U.S. market for medical devices and machinery used in connection with surgical ablation of arrhythmias exceeds $1 billion annually.

19.     BWI's products include the CARTO 3 System, a highly sophisticated electro-anatomical mapping system which creates high resolution, three dimensional images of the heart.   These images can pinpoint the exact location of the irregular electrical impulses responsible for AFib.    Electrophysiologists then use other BWI products, such as THERMOCOOL ablation catheters, to surgically repair the heart.   These procedures are generally performed in the EP laboratories ("EP Labs") of most major hospitals.

20.     AFib is not the only form of cardiac arrhythmia which electrophysiologists treat, and cardiac ablation products are not the only tools electrophysiologists use to treat arrhythmias.   For example, bradycardia and tachycardia are forms of arrhythmia in which patients' heart rates beat too slowly or too fast.   Electrophysiologists may use medical devices such as pacemakers, defibrillators and cardiac resynchronization therapy devices to

treat these conditions.   These products are referred to as cardiac rhythm management ("CRM") products.   Together, the CRM and the AFib ablation products are generally referred to herein, and in the marketplace, as "EP Products." AFib products are only used by, and CRM products are primarily used by, electrophysiologists.   Additionally, electrophysiologists often use ultrasound products to assist in the diagnosis and treatment of arrhythmias. Both BWI and SJM market and sell such ultrasound products.

### The EP Device Specialist's Unique Relationship with the Electrophysiologist

21.   Companies that manufacture and market EP Products provide sales and product service to support their customers by deploying teams of product specialists in market segments throughout the country. BWI is no exception. BWI refers to such teams as PODs, which are comprised of a Territory Manager ("TM") and several Clinical Account Specialists ("CAS").

22.   While all POD members provide services to customers, TMs are generally responsible for developing customer relationships and negotiating sales contracts. The CAS role is generally focused on providing product and procedure support to electrophysiologists and EP Lab staff.

23.   Physicians, such as electrophysiologists, make the determination as to which brand of EP Product they will use in a particular patient procedure.  The quality of the product services provided by and interpersonal skills of a device company's sales and product support specialists plays an important role in the physicians' EP Product brand selection and loyalty.  In other words, customer relationships and the trust established

between the doctors, hospital staff and the sales and technical support teams are very important in establishing customers' brand loyalty for companies such as BWI and SJM.

24.     BWI product support specialists, including Hallett, are routinely present in the procedure room during patient procedures in which electrophysiologists use BWI's products. The product support specialists actively assist electrophysiologists with the cardiac mapping electrophysiologists' rely upon in order for the electrophysiologists to navigate the heart and perform surgical ablations.

25.     BWI's sales and product support specialists (and SJM's equivalent personnel) gain access to the EP Lab in several ways.   Sometimes, they are invited by electrophysiologists, or the EP Lab staff, to cover a specific patient procedure (referred to as a "case") on a specific day.  In that instance, the CAS will arrive at the EP Lab before the scheduled case to help set up the mapping equipment and to otherwise prepare for the case. Once in the EP Lab, the CAS will have an opportunity to engage with the EP Lab staff and the electrophysiologists before, during, and after the case.  Accordingly, the CAS's presence in the EP Lab will afford the CAS the opportunity to learn about other cases to be performed by electrophysiologists that day (or in the near future).   With this type of confidential information, Hallett is able to attempt to, and does in fact, influence the electrophysiologists' decisions as to which EP Products they will use in other EP cases throughout the day (or in the near future).

26.     In other instances, EP Labs will schedule particular days during which sales representatives and technical support personnel from a particular device manufacturer are

13

permitted into the EP Lab to support procedures in which that manufacturer's devices will be used and to discuss the company's products.

27.    During the course of any given day, an electrophysiologist may work on as many as four, if not more, cases in which a variety of different EP Products—both CRM and AFib (including ultrasound)—may be used.  Indeed, sometimes a single patient procedure will require the use of both CRM and AFib products.

28.    Because the BWI POD members are so often in the EP Labs, and because of the valued support they provide, electrophysiologists and their teams develop a great deal of loyalty to BWI POD team members.  BWI POD members (including Hallett), thus, have the ability to, and do, influence physicians' product selection by influencing customer satisfaction, trust, and comfort with BWI's products.

29.    Through their access to electrophysiologists and the EP Lab Staff, SJM sales and technical support staff are able to influence electrophysiologists' product selection and to cross sell the various, AFib, CRM and ultrasound products.  SJM's ability to influence electrophysiologists' product selection in the North Florida markets will be enhanced by SJM's  employment  of  Hallett  who  has  pre-existing  relationships  with  the electrophysiologists who use SJM's and BWI's EP products in the North Florida markets Hallett covered for BWI.

30.    The relationships between electrophysiologists and sales and technical support specialists are critical to the success of medical device companies such as BWI and SJM.

### BWI Hires Hallett and Enters into a Non-Competition Agreement with Him

14

31.     BWI hired Hallett as a member of its sales and technical support services team responsible for servicing and promoting BWI's AFib and ultrasound products to BWI's customers and prospective customers.

32.     In connection with his BWI employment and in consideration of, among other things, his receipt of BWI's confidential information and specialized training, before starting his BWI employment, Hallett executed an Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (the "NCA," a copy of which is attached hereto as Exhibit A).

33.     In executing the NCA, Hallett acknowledged that BWI would provide him with its confidential information to assist him in performing his work effectively and he acknowledged that he would preserve the confidentiality of such information and refrain from working for a competitor of BWI for 18 months after his employment with BWI ended. NCA at § A.

34.     The NCA defines BWI's "Confidential Information" to include "information that [BWI] keeps confidential from competitors concerning such things as . . . names or significance of [BWI's] customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, or other customer or client-specific information; and personal or business information about [BWI's] employees, customers, vendors, consultants, and agents which is not publicly known and is disclosed to you or known by you in connection with your employment with [BWI]." NCA at § B.

35.     In consideration for entering into the NCA and his work, BWI offered Hallett substantial compensation.  In fact, in 2011 and 2012, Hallett earned in excess of $157,000 and $136,000, respectively as a BWI employee.

36.     Paragraph six (6) of Hallett's NCA restricts his ability to work for or provide services to a BWI competitor "in any position and in any location in which [he] **could** disadvantage [BWI] or advantage the competitor by [his] disclosure or use of [BWI's] Confidential Information." NCA at § C, ¶6 (emphasis added).

37.     Moreover, subsequent to his employment with BWI, paragraph 6 requires Hallett and his subsequent employer to provide BWI with written assurances that he will not render services, for eighteen months, to a competitor of BWI.  Specifically, the paragraph 6 of the NCA provides that:

> Except as provided in the next sentence or to any extent prohibited by applicable law, during your employment with any COMPANY and for a period of eighteen (18) months after your last date of employment within the COMPANIES, you will not, directly or indirectly, perform work for any COMPETITOR in any position and in any location in which you could disadvantage any COMPANY or advantage the COMPETITOR by your disclosure or use of CONFIDENTIAL INFORMATION to which you had access.  Following the termination of your employment, you will be permitted to work for any entity or person if (a) the COMPANY with a competitive interest determines that the entity or person for which you wish to work has a diversified business and no portion of the business for which you have indicated that you would render services is a COMPETITOR, and (b) prior to your commencing any work, such entity or person and you each provides written assurance satisfactory to the COMPANY with a competitive interest that you will not render any services for the portion of the business that is a COMPETITOR for a period of eighteen (18) months after your last date of employment within the COMPANIES....

Exhibit A, ¶ 6 (emphasis added).

38.     By failing to provide information about his new position and failing to offer written assurances to BWI, Hallett is preventing BWI from evaluating whether BWI has cause or a need to enforce the other material terms of the NCA.

39.     For example, in addition to the aforementioned rights that BWI has under the Non-Competition Agreement with Hallett, that agreement also prevents him from soliciting BWI's customers during a specific period of time.  NCA at § C, ¶ 7.

40.     If BWI is not informed of Hallett's new position and does not receive written assurances from Hallett that he will not render services for a competitor and to his former customers, BWI cannot assess whether Hallett is in violation paragraphs 6 or 7 of the NCA and cannot enforce its rights under the agreement thereby depriving BWI of the economic value of the bargain.

41.     In the event of a breach of the NCA, and because BWI cannot be adequately compensated as a matter of law for any such breach, Hallett agreed that BWI would suffer irreparable injury and would be entitled to injunctive and other equitable relief, as well as damages. Exhibit A, ¶ 14.

### BWI Provided Hallett with Extraordinary Training and Confidential and Trade Secret Information

42.     Because of the importance of the TMs and CASs to BWI's business, BWI devotes a significant amount of time, effort and expense to their training, and in assisting them to develop, maintain and strengthen their relationships with BWI's customers, including the electrophysiologists, nurses, hospital administrators, purchasing agents and others responsible for the purchase and use of EP Products.

43.    BWI spent substantial resources, both human and financial, educating and training Hallett on human anatomy, diagnostic and therapeutic procedures and how to use, service and support the use of BWI's products.

44.    Hallett spent a significant portion of his time in hospitals and EP Labs building professional relationships with BWI's customers, observing and assisting with procedures, addressing and resolving customer complaints and issues, and training physicians and other health care professionals on the safe and efficacious use of BWI's products. During his relationship building, he learned physicians' practice techniques and habits, product preferences, needs and requirements, and other information about the physicians, which is critical to the ability of Hallett to provide customized service to the physicians. BWI considers this physician-specific information to be part of BWI's Confidential Information. During Hallett's employment with BWI, he developed and obtained such BWI confidential, physician-specific information related to the electrophysiologists he called on for BWI.

45.    BWI maintains some of this customer-specific information in its computer databases including the company's customer relationship management system known as Siebel. In the Siebel system, BWI maintains such information as physician procedure and product use histories, including dates of procedures, products used in specific procedures, and comments on physicians' practices and techniques. BWI also compiles information which characterizes the significance of its customers in terms of the dollar volume of their purchases and the market share they give to BWI. Such information is valuable and

confidential.  All CASs contribute physician and customer-specific data to the Siebel system. Hallett frequently entered such information in the Siebel system.

46.     Hallett was able to develop and maintain relationships in the North Florida market —through the expenditure of significant time, resources, and money by BWI—with the physicians who use and the other individuals who are responsible for purchasing EP Products at customer accounts.  These relationships comprise BWI's significant, protectable, legitimate business interests.

47.     Hallett's BWI customers included those listed in an attachment to BWI's December 17, 2012 letter to Hallett.  A true and accurate copy of BWI's December 17, 2012 letter to Hallett is attached hereto as Exhibit B.

48.     BWI taught Hallett to be an AFib CAS.  In so doing, BWI provided him with Confidential Information as well as extensive, extraordinary and specialized training, including, at the commencement of their employment with BWI, an intensive 12-24 week, multi-component, Global Training Program for field based personnel.

49.     BWI's Field Training Program includes classroom and laboratory work, product use on anatomical models, field training at hospitals, in-house training and sales simulations at BWI's training and education center, and home and computer-based study. BWI trains its TMs and CASs (including Hallett) to understand the specific heart conditions BWI's products are designed to treat such that they can conduct detailed scientific and medical discussions with physicians.  BWI's TMs and CASs learn the coronary anatomy, how to identify arrhythmias, and the proper treatment options in a given situation.  BWI's training program also teaches the sales and product support teams the unique characteristics

of BWI's AFib and ultrasound products—how to use BWI's products and how to teach electrophysiologists to use BWI's products. BWI also teaches TMs to effectively sell BWI's products using BWI's methodologies; educates TMs and CASs how to promote BWI products against the products of competitors such as SJM; and trains CASs to effectively and efficiently support AFib ablation cases in the EP Lab.

50.     In addition to his initial training, BWI provided Hallett with continuing training throughout his tenure with the company. Such training included annual National Sales Training seminars at which new marketing and sales strategies were shared and product launch information was provided to the sales team. BWI also trained him during quarterly regional meetings and frequent POD meetings, during which he was regularly updated on marketing strategies, pricing and discount programs, and technical assistance on product use and proprietary market intelligence. Additionally, BWI provided Hallett with periodic training in the form of "Critical to Know" presentations on updated sales and marketing strategies.

51.     From the beginning of his employment with BWI, BWI also provided Hallett with confidential information disseminated via electronic mail and made accessible on BWI's email and computer databases. Such information, including customer product pricing and purchasing histories, promotional programs, marketing strategies, and other valuable information is used by TMs and CASs (including Hallett).

52.     BWI's confidential information is not generally available to the public and BWI undertakes appropriate measures to ensure such information is maintained as confidential.

53.     BWI also regularly provides its sales and product support team (and BWI provided Hallett) with such Confidential Information as updated marketing plans and strategies, pricing, sales strategies, customer contract terms, competitive intelligence, strategic business plans, sales volumes and forecasts, monthly customer sales reports which identify sales by product and dollar volume, analyses of clinical data supporting BWI's products, customer purchasing habits, requirements and trends, customer preferences and requirements, product launch timelines and product pipeline information, instructions and guidance on how to conduct selling activities to BWI's customers, BWI research and development initiatives and product pipeline information, as well as BWI market share data and other trade secret and confidential information.  Such information is confidential and valuable and in the hands of a competitor can be used to disadvantage BWI's commercial operations.

54.     BWI provided Hallett with the company's Confidential Information and he used such information to perform his job for BWI.

55.     At the time of Hallett's departure from BWI, Hallett had knowledge of and regularly used during his employment with BWI, BWI's product pricing, pricing programs (including pricing floors), discount and rebate programs, marketing strategies, customer purchasing patterns and procedure volume information, physician practice preferences, requirements, habits and needs, market development strategies, and other similar information which BWI maintains as confidential.  The BWI product pricing and discount information of which Hallett has knowledge is current, confidential and valuable to BWI.  Such information

will be current and applicable to BWI customers for at least the next year and in many cases for much longer.

56.     BWI goes to great lengths to protect all of the confidential information described above by, among other things, having employees sign Non-Competition Agreements containing non-competition, non-solicitation and confidentiality covenants, by limiting employees' electronic access to the information via passwords, and through the use of other security measures.    Additionally, customers are required to maintain the confidentiality of product pricing and discounts BWI offers to them.

57.     The Confidential Information BWI provides the TMs and CASs, including Hallett, gives the BWI sales force a competitive advantage in the market.

58.     The BWI confidential information known by Hallett is valuable to BWI, current, not known to the public, and not capable of being accurately and independently ascertained by the public.

59.     The confidential information that Hallett has acquired, including the substantial customer relationships he has developed and maintained expressly for BWI, is worth millions of dollars in annual revenue to BWI.

### BWI's Failed Attempts in Achieving Hallett's Compliance with his Non-Competition Agreement

60.     On December 17, 2012, BWI sent Hallett a letter asking him to provide BWI with information regarding the services he was providing to SJM.   In response to the letter, Hallett sent an email asserting that he was not employed by anyone.

61.     In February 2013, BWI received information suggesting that Hallett was indeed performing services for SJM.   BWI thus sent letters to Hallett and to SJM asking that

they provide BWI with information regarding the terms of Hallett's employment with SJM. Copies of BWI's February 22, 2013 letters are attached hereto as Exhibits C and D.

62.     Aside from initiating the instant action, neither Hallett nor SJM has responded to BWI's inquiries regarding Hallett's employment with SJM.  Hallett and SJM have asserted that Hallett can, without violating the NCA, work for SJM by selling or supporting the sale of SJM's CRM products to Hallett's former BWI customers and selling or supporting the sale of SJM's AFib products to new customers.

### Conclusion

63.     Hallett has breached the NCA by failing to give BWI written assurances, satisfactory to BWI, that he will not render services for a competitor for the 18-month period following his last date of employment with BWI.

64.     BWI has legitimate business interests justifying the enforcement of the restrictive covenants set forth in the NCA.  Specifically, BWI has a legitimate business interest in: the extraordinary and specialized training it provided Hallett; the private, Confidential Information which it has given Hallett; BWI's substantial relationships with specific and existing customers; and the customer and client goodwill BWI has established in the region which Hallett serviced for BWI.  Without Hallett's compliance with paragraph 6 of his NCA, BWI cannot enforce its rights to protect these legitimate business interests.

65.     All conditions precedent to BWI's right to enforce the Non-Competition Agreement have occurred, have been performed, or will be performed by BWI.

### COUNT I – Breach Of Contract

66.     BWI realleges paragraphs 1 through 65 as though fully set forth herein.

67.    Pursuant to the NCA, Hallett agreed to give BWI written assurances, satisfactory to BWI, that he would not render services for a competitor for the 18-month period following his last date of employment with BWI.

68.    Hallett has breached his NCA with BWI.

69.    BWI has been damaged as a result of Hallett's conduct because Hallett has thwarted BWI's efforts to evaluate whether Hallett's employment with SJM violates the terms of the NCA and whether BWI must undertake efforts to enforce other terms of the NCA to protect its legitimate business interests.

## COUNT II – Declaratory Judgment

70.    BWI realleges paragraphs 1 through 69 as though fully set forth herein.

71.    BWI seeks declaratory judgment pursuant to pursuant to 28 U.S.C. § 2201.

72.    An actual, definite, continuing and substantial controversy exists between BWI, Hallett and SJM regarding SJM's ability to hire Hallett and other BWI TMs and CASs who are party to a BWI non-compete agreement and have such individuals, including Hallett, call on and service their former BWI clients, accounts or customers (including the physicians, EP Lab staff, nurses, hospital administrators and other persons who work at or who are employed by the hospitals at which the former BWI employees provided services for BWI during the last 12 months of their BWI employment) for SJM for the purpose of selling or servicing SJM's AFib, ultrasound or CRM products (collectively, "EP Products") or to have such individuals sell or service SJM's AFib (including ultrasound) products to new clients, accounts or customers.  BWI contends the NCAs prohibit such activities; SJM and Hallett contend the NCAs do not prohibit such activities.

73.     In addition to Hallett, SJM has recently hired other BWI sales and product support representatives who are subject to BWI non-compete agreements containing the same or similar provisions as those set forth in Hallett's NCA and SJM has announced its intention to hire additional BWI sales and product support representatives all for the purpose of, among other things, selling, soliciting the sale of and servicing SJM's EP Products to the individuals' former BWI accounts, customers and clients and selling and supporting the sale of SJM's AFib and ultrasound Products to any customers.

74.     The dispute between BWI, Hallett, and SJM is real and immediate and has caused BWI injury and, without resolution, will continue to cause injury to BWI.

75.     BWI seeks a declaration that SJM may not employ Hallett, or any other current or former BWI employee who is bound by the terms of a BWI non-competition agreement with terms similar to those contained in Hallett's NCA for the purpose of having such current or former BWI employee: a) sell or support the sale of SJM EP Products to their former BWI customers, or b) sell or support the sale of SJM's AFib and ultrasound products to any customers for the duration of the NCA.

WHEREFORE, BWI respectfully requests that the Court enter judgment in favor of BWI and against Hallett and SJM as follows: (i) granting BWI specific performance against Hallett with respect to Paragraph 6 of the NCA by commanding the disclosure of the information required thereby, (ii) declaring that, for 18 months, Hallett may not work for SJM for the purpose of selling or supporting the sale of SJM's EP Products to the hospitals, physicians and other customers with whom he interacted in the last 12 months of his employment with BWI and that Hallett may not sell or service SJM's AFib and ultrasound

products to any SJM customers, (iii) declaring that SJM may not solicit, hire or employ Hallett and any other current or former employee of BWI who is party to a BWI non-competition agreement for the purpose of having such employee, during the term of their BWI non-competition and non-solicitation restrictions, directly or indirectly work with, support, market or sell: a) SJM's EP Products to their former BWI accounts, customers and clients, or b) SJM's AFib and ultrasound products to any accounts, customers or clients, and (iii) awarding BWI such other and further relief as the Court deems just and equitable

### JURY DEMAND

Biosense Webster, Inc. demands a trial by jury on all issues so triable.

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.

By: s/Eric S. Roth
    ERIC S. ROTH (**Trial Counsel**)
    Florida Bar No. 864935
    eroth@stearnsweaver.com
    CHRISTOPHER A. BARNETT
    Florida Bar. No. 360510
    cbarnett@stearnsweaver.com
    150 West Flagler Street, Suite 2200
    Miami, FL 33130
    Telephone: (305) 789-3200
    Facsimile: (305) 789-3395
    *ATTORNEYS FOR DEFENDANT,*
    *BIOSENSE WEBSTER, INC.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on <u>March 20, 2013</u>, I electronically filed the foregoing

document with the Clerk of Court using CM/ECF. I also certify that the foregoing document

is being served this day on all counsel of record or pro se parties identified on the Service

List below in the manner specified, either via transmission of Notices of Electronic Filing

generated by CM/ECF or in some other authorized manner for those counsel or parties who

are not authorized to receive Notices of Electronic Filing.

s/Eric S. Roth          

Eric S. Roth

## SERVICE LIST
*St. Jude Medical, et al. v. Biosense Webster Inc.*
**CASE NO.:6-13-cv-000333-JA-TBS**
**United States District Court, Middle District of Florida**

James A. Gale, Esquire
Florida Bar No.: 371726
JGale@FeldmanGale.com
Christopher P. Demetriades, Esquire
Florida Bar No.: 112917
CDemetriades@FeldmanGale.com
Alejandro J. Fernandez, Esquire
Florida Bar No.: 032221
AFernandez@FeldmanGale.com
Christina DeAngelis, Esquire
CDeAngelis@FeldmanGale.com
Feldman Gale, P.A.
One Biscayne Tower, 30th Floor
2 South Biscayne Boulevard
Miami, Florida 33131-4332
Telephone: 305-358-5001
Facsimile: 305-358-3309
Attorneys for Plaintiff
*Service via CM/ECF*