IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

ST. JUDE MEDICAL S.C. INC., a Minnesota
Corporation, ANDREW HALLETT, an
individual,

                                                                                       CASE NO.: 6:13-cv-00333-JA-TBS

    Plaintiffs,

v.

BIOSENSE WEBSTER, INC., a California
corporation,

    Defendant.
_____/

**DEFENDANT'S MOTION FOR LIMITED EXPEDITED DISCOVERY AND
INCORPORATED MEMORANDUM OF LAW**

Defendant Biosense Webster, Inc. ("BWI") pursuant to Rules 26, 30 and 34 of the Federal Rules of Civil Procedure, hereby submits its Motion for Limited Expedited Discovery and Incorporated Memorandum of Law ("Motion"). In support thereof, BWI states as follows:

**INTRODUCTION**

This case is one of a trilogy of cases pending in this Court arising from St. Jude Medical S.C. Inc.'s (SJM) continuing assault on BWI's team of Florida sales and product support specialists.[1] In this, the most recent of the cases, BWI's former representative, Andrew Hallett, has apparently begun providing services for SJM; however, Hallett and SJM are refusing to disclose to BWI the terms of Hallett's employment with SJM. Among

---

[1] See *Douglas Kissell, William Luis Hamel, Adam Dietterich, and St. Jude Medical S.C., Inc. v. Biosense Webster Inc.*, Case No.: 6:12-cv-1569-Orl-28TBS, United States District Court, Middle District of Florida ("*Kissell*") ; *Biosense Webster, Inc. v. Gregory A. Scott*, Case No.: 6:13-cv-00258-JA-TBS, United States District Court, Middle District of Florida ("*Scott*").

other things, BWI is concerned that SJM has or soon will deploy Hallett to call on his former BWI customers for the purpose of selling or servicing the same products Hallett worked with for BWI in violation of Hallett's non-compete obligations to BWI. Because SJM and Hallett have refused to disclose what Hallett is or will be doing for SJM, Hallett has breached the clear terms of his non-compete agreement and BWI is now confronted with the clear and present threat of irreparable harm in the form of lost customers, lost sales, and unlawful competition by Hallett and SJM in breach of prohibitions Hallett agreed to by contract. To avoid these consequences and to enable BWI to determine what further actions it must take to protect its legitimate business interests, BWI requests that the Court enter an order:

1) Requiring Hallett to provide the limited documents requested in "Exhibit A" to this motion;

2) Requiring SJM to provide the limited documents requested in "Exhibit B" to this motion;

3) Permitting BWI to depose Hallett concerning the work he is currently performing or is expected to perform for SJM, the products he is selling/servicing for SJM or is expected to sell/service, and the customers Hallett has called on/serviced or is expected to call on/service; and

4) Permitting BWI to depose the SJM employee who hired Hallett concerning the reason(s) for Hallett's hire.

BWI's ability to assess the risk Hallett's SJM employment poses and BWI's ability to protect its customer relationships depend upon the information sought by this motion. BWI's fears, and pressing need for this information, are not unfounded or speculative. As BWI learned from the hiring and employment files produced in the *Kissell* case, SJM hired the former BWI employees who are parties to that case for the express purpose of selling competing AFib products to their former BWI customers in direct violation of their contractual obligations to BWI.[2]

BWI has since made multiple, good faith efforts to obtain from Hallett and SJM basic information regarding Hallett's role with and responsibilities for SJM. However, Hallett and SJM have refused to provide any information to BWI and have refused to schedule or conduct the Rule 26 meeting required by the Court's March 14 Order (DE 5). BWI, therefore, must ask the Court to compel the disclosure of this basic information.

## DISCUSSION

*The Electrophysiology device business and the sales reps' customer relationships*

BWI and SJM manufacture and market products which are used primarily by physicians known as electrophysiologists to treat arrhythmic conditions of the heart (e.g., abnormal heart rhythms). Electrophysiologists use BWI's cardiac mapping products to obtain three dimensional images of the heart. These images assist the physicians in identifying the location on the heart muscle that is causing abnormal electrical impulses. Identifying the abnormal electrical impulses enables physicians to treat the abnormal heart rhythms with catheters capable of ablating or burning the abnormal heart tissue. These products are generally referred to as Atrial Fibrillation or AFib products. BWI also manufactures and

---

[2] *See, e.g., Kissell* at DE 62 (SJM 82-85).

#2755180 v3

markets intracardiac echocardiography catheters ("ICE" or ultrasound catheters) which electrophysiologists also use in the diagnosis and treatment of arrhythmic disorders of the heart. While the success of BWI's business is largely dependent on the quality and reliability of its products, BWI's success is also determined by the quality and depth of the relationships BWI's employees develop and maintain with the electrophysiologists who use BWI's products.

SJM, one of BWI's main competitors, manufactures and markets to electrophysiologists SJM's own versions of AFib and ultrasound products. Additionally, SJM manufactures and markets cardiac rhythm management ("CRM") products such as pacemakers, which are also used almost exclusively by electrophysiologists to treat heart rhythm disorders. Electrophysiologists thus regularly use CRM, AFib and ultrasound products (collectively, "EP Product"), and occasionally electrophysiologists will use multiple types of EP Products during the same patient procedure.

As a result of the highly competitive nature of the electrophysiology products business and the significance of physician relationships to their businesses, both BWI and SJM require their employees to enter into confidentiality and non-compete agreements, for the purpose of protecting their critical confidential information, including their customer relationships. Such protection is critical because both BWI and St. Jude entrust their sales and product support specialists with the customer relationships on which the companies depend for success. In fact, the sales and product specialists are often times the sole or primary contact between the electrophysiologists and the company. Accordingly, they are directly involved in developing and maintaining the customers' confidence and goodwill.

In turn, they have the ability to influence physicians' product selection, drive sales and convert customers to the competition should they move to a competitor.

*Hallett and the Non-Compete Agreement*

BWI hired Hallett to be a clinical account specialist responsible for supporting electrophysiologists' use of BWI's products. At the commencement of his employment with BWI, Hallett, like other members of BWI's sales and product support team, signed a non-compete agreement ("NCA"). The NCA specified that subsequent to his BWI employment, Hallett would not, among other things, use or disclose to third parties any of BWI's confidential information (which specifically includes information regarding BWI's customer relationships), work for a competitor in a position in which he could use BWI's confidential information or directly or indirectly provide services to his former BWI customers.[3]

The NCA defines "Confidential Information" to include the "names and significance of [BWI's] customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, or other customer or client-specific information [as well as] personal or business information about [BWI's] customers. . . ." BWI vigorously protects such information about its customer relationships because the success of its business, as noted above, depends to some degree on the relationships its employees develop and maintain with BWI's customers.[4]

---

[3] The NCA which Hallett executed is attached hereto as Exhibit C.
[4] This Court has previously ruled that under New Jersey law, which governs the NCA, confidential information regarding customer relationships is subject to protection by restrictive covenant. *See Godwin Pumps of America, Inc. v. Ramer*, 2011 WL 2670191 * 4 (M.D. Fla.) (interpreting restrictive covenants governed by New Jersey law); *see also Nat'l Reprographics v. Strom*, 621 F. Supp.2d 204 (D. NJ 2009).

#2755180 v3

Page 5 of 16

Critical to BWI's ability to enforce the NCA is the obligation that employees inform the company of the terms of their subsequent employment during the post-employment term of the restrictive covenants. Accordingly, after the termination of Hallett's employment with BWI, Hallett, pursuant to the NCA, became obligated to inform BWI of his new employment—independent of any need for BWI to ask for the information.[5] Nevertheless, by letter dated December 17, 2012, BWI asked Mr. Hallett to confirm the terms of any services he was providing to SJM. Mr. Hallett responded the same date by stating that "I am not sure what information you have but I am not employed by anyone at this time."[6]

Because it had no reason to doubt Mr. Hallett's representation that he was not working for or providing services to SJM, BWI accepted the representation and dropped the matter. Several weeks later, BWI received additional information suggesting that Hallett was in fact providing services for SJM, likely in violation of his obligations to BWI under the NCA. Accordingly, on February 22, 2013, BWI wrote to both Hallett and SJM and requested the disclosure of the terms of Hallett's employment with SJM.[7] Rather than responding, SJM and Hallett initiated this action, giving rise to the suspicion that they are purposefully hiding pertinent information as BWI recently discovered in the *Kissell* matter.

Based on what BWI has learned in the *Kissell* case, BWI is concerned that SJM has hired Hallett to sell AFib products to his former customers. Specifically, in *Kissell*, SJM's in-house counsel represented to BWI in August 2012 that SJM had hired the former BWI

---

[5] *See* NCA at ¶ 6.
[6] *See* BWI's December 17, 2012 letter to Mr. Hallett and his response thereto, attached hereto as Exhibits D and E.
[7] *See* Exhibits F and G, attached hereto.

#2755180 v3

employees to work with SJM's CRM products.[8] But, in February 2013 when SJM finally produced some records related to its decisions to hire the former BWI employees, the documents unequivocally demonstrated that SJM hired the former BWI employees for the express purpose of selling and servicing SJM's competing AFib products to the very same customers the employees called on for BWI.[9] SJM explained, in one important document, that it needed to hire the BWI employees because "Biosense will continue to compete and has a hold on the physicians they currently do business with." Indeed, SJM projected that hiring Kissell alone will lead to significant increases in incremental revenues year over year.[10]

These astounding admissions were made in SJM's standard new-hire documents located in the personnel files SJM produced in *Kissell*. The same documents are sure to exist with respect to SJM's employment of Hallett. Moreover, depositions of Hallett and the SJM hiring manager regarding SJM's reasons for the hire will help aid in determining the purpose for Hallett's hire.

Upon receipt of the complaint, BWI promptly initiated a series of attempts to obtain basic information from Hallett and SJM and or to take the appropriate steps necessary to begin the discovery process. Thus, BWI asked SJM and Hallett's counsel to conduct the Rule 26 conference, to agree to the same confidentiality agreement that the parties entered into in *Kissell* and to provide BWI with the same type of information SJM provided BWI in the *Kissell* matter. In response, counsel for plaintiffs has refused to

---

[8] *See Kissell* at DE 8-8.
[9] *See Kissell* at DE 62 (SJM 53-56, 82-85, 114-117).
[10] *Id.*

cooperate with any of BWI's efforts to learn about SJM and Hallett's intentions.[11] Indeed, counsel for SJM and Hallett has stated that it is "extremely premature" to conduct the Rule 26 meeting notwithstanding the fact that there is nothing in the Rules prohibiting the conduct of such a meeting.[12] It is now evident that Plaintiffs' refusal to hold the Rule 26 conference, produce documents related to SJM's employment of Hallett, or even to explain Hallett's responsibilities as required by the NCA are intended to hide this information as long as possible and thereby frustrate BWI's ability to enforce its rights under the NCA.

Given the imminent need to obtain this information and the severity of the potential damage to BWI, limited expedited discovery is essential. Rather than engaging in extensive discovery at this time, BWI seeks only to obtain the following information:

A) **Documents from Hallett set forth in Exhibit "A":**

1. Any documents Hallett sent to or received from SJM from January 1, 2012 until the date Hallett began performing services for or on behalf of SJM.

B) **Documents from SJM set forth in Exhibit "B":**

2. SJM's personnel file pertaining to Hallett;

3. To the extent such documents are not in SJM's personnel file pertaining to Hallett, the following documents:

   a. Hallett's SJM Employment Application(s);

   b. The resume Hallett submitted to SJM;

   c. All documents explaining the reasons for SJM's decision to hire and/or use Hallett's services;

---

[11] *See* email correspondence between Counsel for BWI and Counsel for SJM and Hallett, various dates between February 28 and March 11, 2013, attached hereto as Exhibit H
[12] *See* Exhibit H at February 28, 2013, 9:11 p.m. email from James Gale.

#2755180 v3

d. The "Details for Recruiter Requisition" form for Hallett;

e. The Field Position Data Sheet (FPDS) for Hallett and all documents referenced therein; and

f. All documents relied upon by SJM when preparing the FPDS and/or the "Details for Recruiter Requisition" form related to Hallett's employment.

4. Hallett's employment agreement (including any addenda thereto) with SJM and any other agreement pursuant to which Hallett has performed services for or on behalf of SJM since November 23, 2012, the date Hallett last worked for BWI.

5. The offer letter and any attachments or enclosures thereto Hallett received in connection with his employment with or work for SJM since November 23, 2012.

6. Documents which identify Hallett's job responsibilities for or on behalf of SJM.

7. Documents identifying the customers Hallett has been assigned to service, call on, sell to, promote to, or otherwise conduct business with on behalf of SJM.

8. Documents which identify the customers (e.g., hospitals and physicians) on whom Hallett has called or to whom Hallett has provided services for or on behalf of SJM since November 23, 2012.

9. Documents which refer or relate to the SJM products (e.g., CRM, AFib and ICE/ultrasound products) on which Hallett has received training since November 23, 2012.

C) **Deposition of Hallett and SJM Employee Who Hired Hallett**

BWI seeks to depose the SJM employee that hired Hallett only about the reasons for Hallett's hire. BWI seeks to depose Hallett concerning the work he is currently

performing or is expected to perform for SJM, the products he is selling/servicing for SJM or is expected to sell/service, and the customers Hallett has called on/serviced or is expected to call on/service.

**MEMORANDUM OF LAW**

Rule 26 of the Federal Rules of Civil Procedure grants "broad discretion to the court to alter the timing, sequence, and volume of discovery requests." *Nassau Terminals Inc. v. M/V Bering Sea*, 1999 WL 1293476, at *1 (M.D. Fla. July 1, 1999); *accord Klay v. All Defendants*, 425 F. 3d 977, 982 (11th Cir. 2005) (explaining that "[a] district court is entitled to broad discretion in managing pretrial discovery matters."); *see also* Fed. R. Civ. P. 26(d). Expedited discovery is permitted when the moving party shows "good cause" for its need. *E.g., M/V Bering Sea*, 1999 WL at *1.

Generally, good cause exists and "expedited discovery should be granted when some unusual circumstances or conditions exist that would likely prejudice [the moving] party if he were required to wait the normal time." *See Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. and Fila Sports Inc. v. Helio Import/Export Inc.*, 601 F. Supp. 1, 3 (S.D. Fla. 1983). In addition, "[g]ood cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party." *Semitool, Inc. v. Tokyo Eletron Am.*, Inc., 208 F.R.D. 273, 276 (N.D. Cal. 2002).

Under New Jersey law (which governs the terms of the NCA), employers have a legitimate business interest in protecting their confidential information and their customer relationships and may do so through enforcement of restrictive covenants. *Godwin Pumps,*

2011 WL 2670191 *4; *Karlin v. Weinberg*, 77 N.J. 408 (1975); *Platinum Management, Inc. v Dahms*, 285 N.J. Super. 274 (Law Div. 1995). Here, BWI's NCA defines confidential information to include critical information regarding BWI's customer relationships. The only way BWI can ensure that its customers are not being improperly solicited through Hallett's (or SJM's) use of BWI's confidential information is to obtain from the Plaintiffs the documentation BWI is requesting. Because the Plaintiffs are shielding BWI from learning the true nature of their intentions and delaying BWI's ability to obtain such information by refusing to conduct a Rule 26 conference, BWI has no means of obtaining the necessary information short of judicial intervention.

More than being prejudiced by Plaintiffs' tactics, BWI is faced with the possibility of losing customers to SJM which would cause BWI irreparable harm. *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991). Indeed, it has been held that "in the rush to solicit clients . . . even a few days can suffice to cause irreparable injury in the way of lost clients and reputation in the community." *See Merrill Lynch, Pierce, Fenner & Smith v. Schwartz*, 991 F. Supp. 1480, 1482 (M.D.Ga. 1998).

By contrast, Plaintiffs face absolutely no prejudice by being compelled to produce a few basic documents related to SJM's employment of Mr. Hallett, some of which are surely located in one place: SJM's personnel file for Hallett. Moreover, BWI's document requests are not objectionable as SJM has produced many of the same documents in the *Kissell* matter.[13] The question, therefore, is not whether Hallett and SJM will be required to produce the documents but when.

---

[13] *See Kissell* at DE 62.

#2755180 v3

Some courts have employed a reasonableness test for determining whether expedited discovery should be granted. *See Dell Inc. v. Belgiumdomains*, LLC, 2007 WL 6862341, at *6 (S.D. Fla. Nov. 21, 2007) (stating that [c]ourts have adopted a good cause or reasonableness standard for granting expedited discovery."); *see also Continental Group v. KW Property Mgmnt.*, Case No. 0-60202-CV-Cohn, Southern District of Florida, Order Granted In Part Motion To Expedite Discovery (S.D. Fla. Feb. 17, 2009) (Exhibit I). The reasonableness test is explained in *Continental Group* as follows:

> Under the reasonableness test, courts consider the reasonableness of the request in light of the entire record to date and all the surrounding circumstances. Factors commonly considered in determining the reasonableness of expedited discovery include, but are not limited to: (1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purposes for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made. Citing *Disability Rights Council of Greater Washington v. Washington Metropolitan Area Transit Authority*, 234 F.R.D. 4, 6 (D.D.C. 2006).

As to the first factor, the Middle District's Local Rule 4.06 requiring documents supporting a preliminary injunction motion to be served with the motion places BWI in a difficult situation in this case. BWI needs the information sought by this motion in order to determine whether Hallett and SJM are competing unfairly and to evaluate whether a preliminary injunction motion is appropriate. Indeed, the absence of a preliminary injunction motion suggests that Plaintiffs have succeeded in their scheme to hide the information BWI was ultimately able to obtain in *Kissell*. While Plaintiffs hide the true nature of Hallett's employment, they have, at the same time, requested, in their Complaint, that Hallett be permitted to engage in activities which they know BWI considers to be violative of the NCA. Thus, absent the disclosures sought by the motion, BWI has no way

of knowing whether Hallett is acting appropriately, whether, as in the *Kissell* case, Hallett was actually hired for the express purpose of selling SJM's AFib products to his former BWI customers in violation of the NCA or whether Hallett is engaging in other conduct for SJM which conduct violates his obligations to BWI. As such, absent a representation from Hallett and SJM that Hallett will not, during the pendency of this litigation, call on or provide any services to his former BWI customers (as identified in BWI's December 17, 2012 letter), BWI is exposed to the risk that, at any moment, SJM may deploy Hallett to call on his former BWI customers in violation of his non-compete obligations to BWI.[14] That risk alone provides good cause, under the circumstances, to Order SJM and Hallett to make expedited disclosures to BWI.

BWI also satisfies the remaining factors identified in the *Continental* decision. At this time, BWI seeks only limited discovery designed to obtain information regarding SJM's decision to hire Hallett and the responsibilities it has provided him. There is no burden for Plaintiffs to provide the requested documents because many, as exemplified in *Kissell*, are readily available to the Plaintiffs. Moreover, the efficiency goals of expedited discovery justify the discovery sought here. BWI seeks only to learn what SJM and Hallett are doing in order to assess whether BWI must act in order to protect its interest in its confidential information including its valuable customer relationships. If BWI learns Hallett and SJM are honoring the terms of the NCA (by keeping Hallett from selling or servicing SJM EP products to or for his former BWI customers and by restricting Hallett to the sale or service of CRM products to new customers), there may be little more for BWI or the Court to do. Alternatively, if BWI learns, as it did in *Kissell*, that SJM hired BWI's

---

[14] Or that Hallett may, in violation of the NCA, sell AFib or ultrasound products to new customers.

#2755180 v3

former employee to take improperly from BWI relationships upon which it had "a hold," then BWI can take the appropriate actions to protect its rights under the NCA and the common law. For these reasons, it is reasonable for this Court to allow discovery before the Rule 26 conference deadline set forth in its March 14 Order.

## CONCLUSION

WHEREFORE, Defendant Biosense Webster, Inc. moves the Court for the entry of an Order permitting Biosense Webster, on an expedited basis, to: a) obtain from Plaintiffs, Andrew Hallett and St. Jude, the documents described in the attached requests for production, b) requiring Plaintiffs' to produce, within 10 days of the date of the Court's Order, such documents as are in their possession, custody or control; c) allowing Biosense Webster to depose Hallett and the SJM employee that hired Hallett on an expedited basis; and d) granting Biosense Webster such additional relief as the Court deems necessary and proper.

<u>Certification Pursuant to Local Rule 3.01 (g)</u>

I certify that I have conferred with opposing counsel in an effort to reach agreement on the issues set forth in the foregoing Motion. Counsel for plaintiffs objects to the relief sought herein.

Respectfully submitted,

STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.

By: s/Eric S. Roth
    ERIC S. ROTH
    Florida Bar No. 864935
    eroth@stearnsweaver.com
    CHRISTOPHER A. BARNETT
    Florida Bar. No. 360510
    cbarnett@stearnsweaver.com
    150 West Flagler Street, Suite 2200
    Miami, FL 33130
    Telephone: (305) 789-3200
    Facsimile: (305) 789-3395
    *ATTORNEYS FOR DEFENDANT,*
    *BIOSENSE WEBSTER, INC.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on March 20, 2013, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

    s/Eric S. Roth
    Eric S. Roth

# SERVICE LIST

## *St. Jude Medical, et al. v. Biosense Webster Inc.*
## CASE NO.: 6:13-cv-00333-JA-TBS

James A. Gale, Esquire
JGale@FeldmanGale.com
Christopher P. Demetriades, Esquire
CDemetriades@FeldmanGale.com
Christina DeAngelis, Esquire
CDeangelis@FeldmanGale.com
Gregg H. Metzger, Esquire
gmetzger@FeldmanGale.com
Feldman Gale, P.A.
One Biscayne Tower, 30th Floor
2 South Biscayne Boulevard
Miami, Florida 33131
Tel: 305-358-5001
Fax: 305-358-3309

***Attorneys for Plaintiffs***